[No. 19550.   *En Banc.*   June 17, 1926.]

E. L. FOSTER, *Respondent,* v. FORD MOTOR COMPANY, *Appellant,* T. L. IRWIN *et al., Defendants.*[1]

[1] NEGLIGENCE (4)—DANGEROUS INSTRUMENTALITIES AND OPERATIONS—MOTOR TRACTOR.  The manufacturer of the Fordson tractor, which has a tendency to tip over in case great power is applied without having the foot upon the clutch, is not liable for injuries sustained, as for the manufacture of a dangerous instrumentality, where the injuries were sustained by applying great power without having the foot upon the clutch, after notice of the danger therefrom, and in violation of instructions given to the purchaser of the machine (TOLMAN, C. J., FULLERTON and MACKINTOSH, JJ., dissenting).

Appeal from a judgment of the superior court for King county, Gilliam, J., entered April 27, 1925, upon the verdict of a jury in favor of the plaintiff, in an action for personal injuries.   Reversed.

*Battle, Hulbert, Gates & Helsell,* for appellant.

*J. Speed Smith* and *Henry Elliott, Jr.,* for respondent.

ASKREN, J.—Appellant, Ford Motor Company, is engaged in the business of manufacturing Fordson tractors, which are held out to the public as being suit-

[1]Reported in 246 Pac. 945.

able for performing ordinary farm work. Defendants, Irwin and wife, are the owners of one of these tractors, purchased from a dealer in Yakima, for use on their ranch near that city. Respondent, Foster, was employed by the Irwins to work upon their ranch. His work required the use of the tractor in question, and upon the third day of his employment, the tractor became deeply mired in the mud. Being unable to pull the tractor out by its own power on account of the wheels spinning, he secured a shovel and removed a large amount of dirt from a point underneath the rear axle, which was resting upon the mud and prevented the wheels from getting traction. Being still unable to drive the tractor out by its own power, Irwin and Foster secured some planks and placed them against the rear wheels of the tractor, and Irwin, taking the operator's seat, attempted to pull the tractor out. The wheels being blocked, the amount of power exerted raised the front end of the tractor off the ground some six inches. A further attempt was then made to secure traction for the rear wheels, and Foster was ordered to drive, and Irwin took a position in front of the machine. When Foster applied the power to the tractor, the front end raised and the tractor tipped over backwards, falling upon him and severely injuring him.

Thereafter Foster brought suit against Irwin and the Ford Motor Company. The basis of the complaint against the Ford Motor Company was that it manufactured a tractor that was imminently dangerous to life and limb of the operator, because the tractor was negligently constructed and designed, in that approximately one-third of the weight of the tractor was at the front, and two-thirds at its rear; and that it developed tremendous power; that the application of

power, when the tractor would become mired, was sufficient to up-end it; and that the operator sat on a seat between the two rear wheels, so that, when power was applied to the tractor, the operator's position was such that he could not prevent the tractor from up-ending.

As to the defendants Irwin, it was charged that they knew of the inherently dangerous character of the machine; that Foster did not know of it, being unfamiliar with Fordson tractors, and that they failed to notify him of it.

Appropriate answers and replies were filed, bringing the case to trial upon this issue. The jury returned a verdict in favor of Foster against both Irwins and the Ford Motor Company. The court granted Irwins a new trial, but denied a motion of the Ford Motor Company for judgment notwithstanding the verdict, and for new trial.

The Ford Motor Company alone appeals, so that the question to be determined on this appeal is the liability of the Ford Motor Company.

The evidence established that the tractor in question does have its weight distributed approximately one-third to the front, and two-thirds to the rear; that the operator's seat is between the rear wheels of the tractor, and that the clutch pedal, instead of being in front of the operator, as in an ordinary automobile, is at a point somewhat lower, expressed by one witness as "where the operator would naturally drop his foot down to reach it." There was evidence that several tractors had turned over, when being used either upon steep grades, or where the rear wheels were blocked. The testimony of all the witnesses, however, both for appellant and respondent, was substantially to the effect that the tractor could not be tipped over, except

upon a very steep grade, or by applying the power through engaging the clutch quickly while the rear wheels were blocked. Respondent testified upon this point that he did not have his foot on the clutch when the tractor started to up-end, and that he did not take any pains to let the clutch in slowly; that he just did it as he always did. From this, it is argued by respondent that there was sufficient evidence for the jury to find that the tractor in question would up-end with the rear wheels blocked, and the clutch engaged in the ordinary and usual manner. But we think that, the evidence of all the witnesses who testified upon this point being to the contrary, it must be assumed that, at the time the tractor turned over, the power was applied suddenly by the quick engagement of the clutch. The Fordson tractor is an 18½ horsepower motor, and there was no evidence that this one was in any respect different from the rest of the Fordson tractors.

At the time the Irwins purchased the tractor, they were notified by the dealer that, in driving it, the foot should always be kept upon the clutch, and Irwin testified upon the witness stand that he knew of this necessary part of the operation of the tractor, and that he had read portions of the Manual of Instructions put out by the Ford Motor Company for the use of operators of the tractor, and especially that portion under the head of "Important Instructions," as follows:

"Do not hitch a chain or rope around the rear axle housing under any circumstances. When pulling a heavy load, or in case the tractor becomes mired, be sure to keep your foot on the clutch pedal. Do not race the motor or let the clutch in suddenly as this may lift the front end of the tractor off the ground. Should this happen release the clutch immediately. This will bring the front wheels back to the ground at

once. If the tractor should become mired always pull out in low gear. Do not attempt to pull tree stumps or do any similar work that might bring the tractor to a sudden stop."

Irwin testified that he notified Foster to always keep his foot upon the clutch pedal, but this was denied by Foster, and it must be assumed, for the purpose of this decision, that no instruction was given.

[1] Appellant urges that there was no state of facts justifying the submission of the question of its liability to the jury. It urges that the evidence conclusively showed that the tractor, operated according to the instructions set out in the manual, would not up-end. This contention seems to be sound. But respondent insists that the manufacturer of an article which, through its faulty construction, is imminently dangerous to human life, is responsible to any third person using it, unless notice is given to the person injured. There are cases to this effect.

In *Coakley v. Prentiss-Wabers Stove Co.*, 182 Wis. 94, 195 N. W. 388, the user of a camp stove which utilized gasoline for fuel was severely injured from an explosion of the stove, when used in the customary and usual way. The evidence was to the effect that the container was not properly soldered as required by the amount of pressure developed and the explosive substance utilized therein. The court held that the evidence showed a defective method of construction; that the manufacturer, in the exercise of reasonable care, should have known of the defect, and that the manufacturer was liable for injuries to third persons using the same without notice and in the exercise of ordinary care. The court quoted approvingly from the opinion in *Hasbrouck v. Armour & Co.*, 139 Wis. 357, 121 N. W. 157, 23 L. R. A. (N. S.) 876. Reviewing this and other authorities, the court said:

"In determining whether a manufactured appliance, defective in its construction, which is to be sold in the open market, is inherently dangerous, the extent and manner of its intended use must be considered. If it is one the use of which is dependent upon the use of explosive substances, that is an important matter for consideration, and the tests which would be used in ascertaining whether ordinary manufactured articles are inherently dangerous need not necessarily be applied."

In *Peaslee-Gaulbert Co. v. McMath's Adm'r.,* 148 Ky. 265, 146 S. W. 770, Ann. Cas. 1913E 392, 39 L. R. A. (N. S.) 465, a manufacturer was held liable for the death of a third person killed by the explosion of a can of fluid labeled "No. 1 T. Japan Dryer." It appeared that the manufacturer sold the can of dryer in question without any mark on it whatsoever to indicate that it was an explosive substance. The court held:

"If a dealer or merchant, whether he be a wholesale dealer or a retail dealer, or the original purchaser of the article, or the person who makes the sale to the consumer, knows that the article is inherently or imminently dangerous in the use for which it was intended, because of its inflammable or explosive qualities, it is his duty to label or mark the package containing the article in such a way as to indicate its dangerous contents. . . . The authorities are practically agreed that, when a manufacturer puts on the market for use without notice of its dangerous quality an article that is imminently or inherently dangerous, he will be liable in damages to any person who while himself in the exercise of ordinary care suffers injury as a result of the dangerous quality of the article, and the manufacturer as a rule will be charged with notice of the quality of the article that he himself has made, and cannot excuse himself upon the ground that he did not know its dangerous qualities."

But we think that this and other cases cited by

respondent do not establish the rule to be applied to the facts in this case. It may be assumed, for the purposes of this case, that the tractor in question was imminently dangerous, if used in a certain way. *Olds Motor Works v. Shaffer,* 145 Ky. 616, 140 S. W. 1047, 37 L. R. A. (N. S.) 560. It could not be, under the evidence, inherently dangerous, except under the condition which we have before outlined, viz.: the blocking of the rear wheels, and the application of tremendous power. But notice of the dangerous character of the tractor under such conditions was fully set out in the Manual of Instructions. It is admitted that the method of operation was fully explained to the Irwins at the time they purchased the machine, that they read the instructions to be followed regarding its operation if it became mired, and they fully covered a situation like the one now in question. It can hardly be contended that further notice could have been given. It cannot be said that the manufacturer should follow the machine into the hands of servants or employees of purchasers of its tractors, and notify each one of them individually that, in extreme situations, it might become dangerous. While it may be assumed that tractors generally are sufficiently simple, so that one, even though devoid of natural mechanical skill, may learn to operate them in a very short time, it cannot be said as a matter of law that the manufacturer could anticipate that one would attempt to operate its product without previous knowledge, either from experience or from the instructions provided in the manual.

This case bears no similarity to those which involve explosive or poisonous substances bearing either misleading directions or no directions whatsoever indicating the character of the article. The very appearance of a complicated piece of machinery, such as this, is in

itself a sufficient warning to one who desires to use it, that he should acquaint himself with its power and possibilities.

That the manufacturer, who puts out an article with notice to the purchaser of its limitations, restrictions, or defects, is not liable to third persons injured thereby is so thoroughly established as to be undisputed. *Logan v. Cincinnati, N. O. & T. P. R. Co.,* 139 Ky. 202, 129 S. W. 575; *Olds Motor Works v. Shaffer,* 145 Ky. 616, 140 S. W. 1047, 37 L. R. A. (N. S.) 560; *Pullman Co. v. Ward,* 143 Ky. 727, 137 S. W. 233; *Lewis v. Terry,* 111 Cal. 39, 43 Pac. 398, 31 L. R. A. 220; *Griffin v. Jackson Light & Power Co.,* 128 Mich. 653, 87 N. W. 888; *Ward v. Pullman Co.,* 138 Ky. 554, 128 S. W. 606.

The rule is nowhere better stated than in *Olds Motor Works v. Shaffer, supra,* which was an action against a manufacturer for damages sustained by a third person, who was injured by reason of a defective rumble seat in an auto put out by it. It was claimed that the purchaser had knowledge of its defective condition and that fact would relieve the manufacturer. The court said:

"In cases like this, the liability of the manufacturer to third parties, where any liability exists, is put upon the ground that the manufacturer of certain articles intended for general use owes what may be called a public duty to every person using the articles to so construct them as that they will not be unsafe and dangerous, and for a breach of this duty the manufacturer, within the limitations we will point out, is liable in an action for tort—not contract—to third persons who are injured by his breach of duty. The class of cases, however, in which the maker is liable to third parties is quite limited; the general rule being that no liability attaches for injury to persons who cannot be brought within the scope of the contract. There are, however, well-defined exceptions to the rule of non-

liability, and the courts are singularly agreed as to the law applicable to cases of this character. The rules found in textbooks and cases, defining the liability of the maker of the article to third persons who are injured by its use, are stated substantially as follows by all the authorities: (1) When he is negligent in the manufacture and sale of an article intrinsically or inherently dangerous to health, limb or life; (2) When the maker sells an article for general use, which he knows to be imminently dangerous and unsafe, and conceals from the purchaser defects in its construction, from which injury might reasonably be expected to happen to those using it. Under the first class fall articles, such as poisons or dangerous drugs, that are labeled as containing innocent or harmless ingredients; and in this class of cases it is not essential to a recovery by the injured party against the maker that knowledge of his mistake or negligence should be brought home to him. His liability rests upon the broader ground that persons dealing in articles intrinsically and inherently dangerous must use a high degree of care in putting them on the market for the protection of the health and lives of those who may naturally and reasonably be expected to use them. And for his negligence or carelessness alone, without any fraud, deceit, or concealment he may be held accountable in damages to any person injured by their use. *Thomas v. Winchester*, 6 N. Y. 397, 57 Am. Dec. 455. But in the other class of cases, where the article itself is not inherently or intrinsically dangerous to health or life, a third party, seeking to hold the maker liable for injuries suffered by him in the use of the article, must show that the maker knew it was unsafe and dangerous, and either concealed the defects, or represented that it was sound and safe. But even when this is shown, the maker will not be liable, if it is made to appear that the purchaser had knowledge of the defects at and before the third party was injured in using it. [Citing numerous cases.] . . . The rule seems to be that, where the purchaser of an article knows that it is unsafe or dangerous, and with knowledge of this fact invites or permits a third party

to use it, and the third party is injured, he cannot maintain an action for tort against the maker. The reason for this is that the action against the maker proceeds on the theory, and is founded on the fact, that in selling the article he practiced fraud and deceit in concealing the defects that made its use unsafe and dangerous; and, of course, when it is admitted or proven that he has not practiced any concealment, and that the purchaser was well informed as to the defects, the bottom drops out of the case against the maker, and the liability is shifted to other shoulders. Another reason is that the maker's wrongful act in such a case is not the proximate cause of the injury, when it is shown that there was the intervention of a new agent, to wit, the purchaser, who with knowledge of the danger, used and permitted others to use the article."

Respondent cites as authority three of our own decisions. The first one, *Weiser v. Holzman,* 33 Wash. 87, 73 Pac. 797, 99 Am. St. 932, determined the sufficiency of a complaint alleging negligence of a manufacturer in delivering to a dealer a dangerous explosive called "Champagne Cider," as a result of which an employee of the dealer was injured. It was held that an explosive substance came under the general rule of articles inherently dangerous to human life or health the same as poisons.

The second, *Marsh v. Usk Hardware Co.,* 73 Wash. 543, 132 Pac. 241, was an action for damages sustained in using blasting powder. It was held that recovery could be had from the manufacturer as well as the dealer, since both made representations as to the product.

The third, *Mazetti v. Armour & Co.,* 75 Wash. 622, 135 Pac. 633, Ann. Cas. 1915C 140, 48 L. R. A. (N. S.) 213, was an action against the manufacturer for putting out poisonous food. A recovery was sustained.

It is, of course, apparent that these cases, involving explosives or poisonous substances, do not come under

the rules applicable to articles which are imminently dangerous through defects in design or construction.

The judgment is reversed, with instructions to enter judgment for appellant notwithstanding the verdict.

HOLCOMB, PARKER, MAIN, and MITCHELL, J.J., concur.

MACKINTOSH, J. (dissenting)—There was so much evidence of faulty design and construction that a question was raised for a jury's answer.

TOLMAN, C. J., and FULLERTON, J., concur with MACKINTOSH, J.